OPINION
Defendant, Chester Gambrel, appeals from his conviction and sentence on charges of aggravated robbery, felonious assault, and two counts of possessing an unlawful ordnance. Because gun specifications were included with the aggravated robbery and felonious assault charges, the trial court imposed sentences of three years on the two gun specifications (which were merged), eight years on the felonious assault, ten years for aggravated robbery, and one year for the two counts of unlawful possession (which were also merged). The sentences were to be served consecutively, beginning with the sentence on the gun specification, for a total sentence of 22 years.
In support of his appeal, Gambrel asserts the following assignments of error:
 I. The trial court committed plain error prejudicial to the Appellant in failing to charge the jury on all of the elements of felonious assault.
 II. The trial court erred in sentencing the Appellant to consecutive sentences. After considering the record and the assignments of error, we find no error.
Accordingly, the judgment of the trial court will be affirmed.
 I
Gambrel's conviction arose from a botched robbery at the Starfire Gas Station in Piqua, Ohio. On the evening of November 11, 1999, Gambrel entered the gas station, pointed a .38 revolver at Brenda Matthews, the cashier, and threatened to shoot if she did not hand over money. When Matthews refused, Gambrel shot her in the shoulder and fled from the station. Matthews' injuries were life-threatening, as a bullet fragment severely bruised the subclavian artery. If the fragment had gone completely through the artery, Matthews would likely have bled to death. Luckily, however, doctors were able to repair the artery. Matthews also sustained a broken collarbone and a collapsed lung as a result of the shooting.
At trial, conflicting testimony was presented concerning whether Gambrel intended to shoot Matthews. Gambrel's story was that he cocked the gun to show Matthews that he "meant business." However, his thumb slipped off the hammer, and the gun accidentally discharged, without Gambrel having pulled the trigger. Some evidence supported this theory. Specifically, both the police and the crime laboratory tested the gun. In both tests, the gun discharged when the hammer was cocked all the way back and released, even though the trigger had not been pulled. Gambrel also told the police and a girlfriend shortly after the robbery that he did not mean to shoot Matthews.
In contrast, other testimony indicated that Gambrel knowingly caused Matthews physical harm. First, Matthews told the police on the night of the shooting that she saw Gambrel actually pull the trigger. (Matthews did later tell police she could not remember whether Gambrel had pulled the trigger or the hammer.) Additionally, Gambrel's girlfriend, Kim Meers, testified about comments Gambrel made after the robbery. Specifically, Gambrel said he had "no choice" but to shoot Matthews because she wouldn't listen to him. He also remarked that he had "put Piqua on the map."
Meers gave this testimony as a State witness, and did not tell the police most of what she testified to at trial until shortly before trial. Moreover, during cross-examination by the defense, Meers contradicted her earlier testimony, i.e., on cross, Meers testified that Gambrel also said he did not mean to shoot Matthews. In view of these facts, the accuracy of any testimony Meers gave is somewhat suspect.
Archer Roberts was Gambrel's friend and talked to Gambrel the day after the robbery. At that time, Gambrel said that he told the gas station clerk to give him all her money. He then shot her when she hesitated. Additionally, Gambrel told Roberts that if the police questioned him, he (Gambrel) would say the shooting was an accident.
Like Meers, Roberts gave a different story to the police when he was originally questioned, and his account could be questioned on that basis. However, another witness, Denver Banning, was more convincing. Banning met Gambrel for the first time the day after the robbery. At the time, Banning was in town to visit his grandmother, who was ill. The connection between the men was that Gambrel's aunt helped care for Banning's grandmother. As a result, the two men met each other at the grandmother's house. On the day after they met (November 13), Gambrel told Banning about the robbery. Gambrel said that he shot Matthews in the right shoulder after she refused to hand over money. According to Banning, Gambrel was not sad. Instead, he was "thrilled" and had no remorse. Banning told his mother about the crime the next morning (November 14).
Information about Gambrel's potential involvement in the crime was given to the police the same day, i.e., on November 14, 1999. Following up on the tip, the police drove to the apartment where Gambrel had been staying. However, on the way, they spotted Gambrel on the street and arrested him. At the time of the arrest, Gambrel had the spent casing from the bullet and some newspaper clippings about the robbery in his pocket.
Because Gambrel was a minor at the time of the alleged crime, a complaint was originally filed in Miami County Juvenile Court. Due to the nature of the crime, the Juvenile Court transferred the case to Miami County Common Pleas Court. Gambrel was then indicted on charges of aggravated robbery and attempted aggravated murder (both with gun specifications), as well as two counts of possessing a dangerous ordnance. These latter charges involved two sawed-off shotguns found at Gambrel's residence. During trial, Gambrel pled guilty to all charges except attempted aggravated murder. Consequently, the only issue before the jury was Gambrel's culpability for that crime.
The trial court's instructions gave the jury a choice among attempted aggravated murder, felonious assault, and negligent assault. Additionally, the jury was charged on the theory that the shooting was an accident, which would have allowed the jury to exonerate Gambrel. Ultimately, the jury found Gambrel not guilty of attempted aggravated murder and guilty of felonious assault.
As we mentioned earlier, the first assignment of error is based on the trial court's alleged plain error in failing to instruct the jury on all elements of felonious assault. This point is raised as plain error because Gambrel did not object at trial to the jury instructions.
In State v. Underwood (1983), 3 Ohio St.3d 12, syllabus, the Ohio Supreme Court held that "failure to object to a jury instruction constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise." Plain error is recognized with "utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus.
In the present case, the specific alleged error is that the trial court failed to define "knowingly" during the instructions on felonious assault. Gambrel says this failure is crucial because the jury was never able to properly consider whether the State proved all the necessary elements of felonious assault. By comparison, the jury was instructed on the meaning of "purposely" in the context of the attempted aggravated murder charge, and was able to make a finding that Gambrel did not act "purposely" when he shot Matthews.
We disagree with Gambrel's position, because the trial court did instruct the jury on the essential elements of felonious assault. As pertinent to this case, the elements of felonious assault are that:
(A) No person shall knowingly * * *:
* * *
 (2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordinance.
R.C. 2903.11. When the trial court instructed the jury, it first covered the elements of aggravated murder and aggravated robbery. During this discussion, the court defined various terms, including "cause," "purposely," "attempt," "knowingly," "owner," "possession," and so on. Knowingly was defined as follows:
 A person acts knowingly, regardless of his purpose, when he is aware that his conduct will cause a certain result or he is aware that his conduct will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.
 After discussing attempted aggravated murder, the court then told the jury that:
 If you find that the State failed to prove that Aggravated Murder was purposely attempted to be caused or if you are unable to agree that the State proved these elements, you will proceed with your deliberations and decide whether the State has proved beyond a reasonable doubt the offense of felonious assault.
 Felonious Assault is knowingly attempting to cause physical harm to another by means of a deadly weapon. Before you can find the Defendant guilty of Felonious Assault, you must find beyond a reasonable doubt that on or about the 11th day of November, 1999, and in Miami County, Ohio, the Defendant attempted to cause physical harm to another by means of a deadly weapon.
 Physical harm to persons means any injury, illness, or other psychological impairment, regardless of its gravity or duration.
 I have previously informed you of the definitions of attempt, deadly weapon, and cause, and will not repeat them here.
 If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of Felonious Assault, your verdict must be guilty of felonious assault.
 However, if you find that the State failed to prove beyond a reasonable doubt all the elements of a Felonious Assault, then your verdict must be not guilty of that offense; and in that event, you will continue your deliberations to decide whether the State has proved all the essential elements of the lesser included offense of Negligent Assault.
Because the court mentioned all the elements of felonious assault, the court gave the jury the needed information to decide if Gambrel's conduct fit the crime. The error, if any, was in failing to re-define the term "knowingly," or to specifically include "knowingly" in the terms that the court had previously defined and would not repeat. We see no error in this regard, as the term was previously defined, and instructions to the jury are considered in their entirety. See, e.g., State v. Price (1979),60 Ohio St.2d 136, 137, paragraph four of the syllabus ("[a] single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge").
As an additional point, we note that the evidence was undisputed that Gambrel entered the station, pointed a gun at Matthews, and said, "Give me all your money, you fucking bitch or I'll shoot you." Under relevant authority, these facts alone were enough to support a conviction for felonious assault. State v. Green (1991), 58 Ohio St.3d 239 . Therefore, even if we had found error, we could not conclude that a manifest miscarriage of justice occurred.
Based on the above discussion, the first assignment of error is overruled.
 II
In the second assignment of error, Gambrel contends that the trial court erred in imposing consecutive sentences. This claim is based on the trial court's finding that Gambrel was on probation in the State of Georgia at the time the robbery was committed. This finding, in turn, made Gambrel eligible for consecutive sentences under R.C. 2929.14(E)(4).
As an initial point, Gambrel says that the probation finding made by the trial court is "believed to be inaccurate." Next, Gambrel argues that a jury should have decided his probationary status, since the finding on that point increased his penalty beyond the prescribed statutory maximum. To support this argument, Gambrel cites the recent United States Supreme Court decision in Apprendi v. New Jersey (2000), 530 U.S. ___,120 S.Ct. 2348, 147 L.Ed.2d 435.
After reviewing the record, we find no error on the part of the trial court. As a preliminary point, we reject the argument that Apprendi casts doubt on the trial court's sentencing decision. In Apprendi, the defendant was indicted on 23 charges related to various shootings involving an African-American family that had moved into the defendant's all-white neighborhood. However, none of the charges referred to New Jersey's hate crime statute, nor did any charge allege that the defendant had acted on the basis of racial bias. Id. at ___, 120 S.Ct. 2352. After the defendant pled guilty to three charges, the State filed a motion to enhance the penalty on one charge, based on the hate crime statute. This statute allowed extension of a defendant's prison term if the trial judge found by a preponderance of the evidence that the defendant had racial or other improper motives for intimidating others. Id. at ___,120 S.Ct. 2351. As applied to the particular case, the penalty could be increased to twenty years from the ten year period that was already statutorily authorized for second degree felonies. However, after holding an evidentiary hearing, the trial court actually added only two years. Id. at ___, 120 S.Ct. 2352.
The New Jersey Supreme Court upheld the enhanced sentence, but the United States Supreme Court reversed, finding a due process violation. In particular, the Court held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at ___, 120 S.Ct. 2362-63. With this exception, the Court endorsed the rule proposed in the concurring opinions, i.e., that a legislature cannot constitutionally:
 remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt.
Id. at ___, 120 S.Ct. 2352.
In Apprendi, the majority commented on the "constitutionally novel and elusive distinction between `elements' and `sentencing factors'." Id. at ___, 120 S.Ct. 2365 (citation omitted). Accordingly, the majority held that the proper inquiry "is not one of form, but of effect — does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" Id.
Applying this standard to the sentencing factors involved in the present case, we note that the jury's guilty verdict on the felonious assault charge authorized a potential prison term of two to eight years. See R.C. 2903.11(D) and R.C. 2929.14(A)(2). Gambrel's prior guilty pleas to the aggravated robbery, gun specifications, and possession of dangerous ordnance charges authorized prison terms, respectively, of three to ten years, three years, and six to twelve months. See R.C.2911.01, R.C. 2941.145, R.C. 2923.17(D), and R.C. 2929.14(A)(1), (A)5), and (D)(1)(a)(ii). Therefore, the maximum possible sentence authorized by the guilty verdicts would have been eight years for felonious assault, ten years for aggravated robbery, three years for the gun specification, and twelve months for possession of a dangerous ordnance, for a total of 22 years. This is precisely the sentence Gambrel received. As a result, we do not think Gambrel was exposed to a greater punishment than was authorized by the jury's verdict. This is not a situation like Apprendi, where the defendant was indicted and convicted of a specific offense that carried a particular penalty, and was then exposed to an additional penalty not encompassed by the indictment. Purely as an example, any defendant in Ohio who commits a first degree felony risks being sentenced to a maximum of ten years in prison.
The court in Apprendi did note that the term "sentencing factor" is not "devoid of meaning," but instead "describes a circumstance, which may be either aggravating or mitigating in character, that supports a specific sentence within the range authorized by the jury's finding that the defendant is guilty of a particular offense." (Emphasis in original.) Id. at ___, n. 19, 120 S.Ct. 2365, n. 19. In contrast, when "`sentence enhancement' is used to describe an increase beyond the maximum authorized statutory sentence, it is the functional equivalent of a greater offense than the one covered by the jury's verdict." Id.
In the present case, the only real difference in sentencing (other than the trial court's choice among the range of sentences) resulted from the court's decision to impose consecutive rather than concurrent sentences. This determination was based on R.C. 2929.14(E)(4), which states that:
 If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
Consistent with this statute, the trial court found that consecutive sentences were necessary to protect the public and to punish Gambrel. The court also said that the sentences were not disproportionate to the seriousness of Gambrel's conduct and to the danger he posed to the public. Under the statute, the court then had to make only one of the following findings: a) that Gambrel was under post-release control for a prior offense; b) that the harm caused was so great that no single prison term would adequately reflect the seriousness of Gambrel's conduct; or c) that Gambrel's history of criminal conduct showed that consecutive sentences were needed to protect the public from future crime. The trial court made not just one of these findings; instead, the court concluded that all three applied.
To the extent that these sentencing factors require "factual" determinations, one might argue that, under Apprendi, they must be submitted to a jury. However, R.C. 2929.14(E)(4)(a) and (c) clearly involve a defendant's prior convictions and are permissible even under a broad reading of Apprendi. The remaining factor, which relates to the harm caused by the crime, is something courts typically consider when making sentencing decisions. Consequently, R.C. 2929.14(E)(4)(b) is also not objectionable. As the court said in Apprendi, aggravating or mitigating factors differ from "sentence enhancement." We do note that Gambrel's probationary status alone was enough to merit consecutive sentences.
Furthermore, while no Ohio authority exists on this point, at least one court in another jurisdiction has found Apprendi inapplicable to consecutive sentencing situations. See People v. Primm (Dec. 29, 2000), Ill. First Dist. App. No. 1-97-3685, unreported. In Primm, the Illinois First District Court of Appeals rejected application of Apprendi in such a situation, stating that:
 [c]onsecutive sentences determine only the manner in which the sentence for each individual offense is to be served and have nothing to do with the length of each discrete sentence. * * * [W]hen sentences are "made consecutive to one another, a new single sentence [is] not formed."
Id. at p. 13, quoting from Thomas v. Greer (1991), 143 Ill.2d 271, 278,573 N.E.2d 814.
Finally, the United States Supreme Court noted in Apprendi that recidivism is a traditional basis for increasing an offender's sentence, and that procedural safeguards typically surround the "fact" of a prior conviction. Apprendi, 530 U.S. at ___, 120 S.Ct. 2361-62. Obviously, the existence of a prior conviction or the status of a defendant as a probationer, parolee, etc., would not normally be disputed. As applied to this case, Gambrel expresses doubt, as we said, about his "status" at the time of the robbery. However, Gambrel would have been in a better position than anyone to know if he was on probation. Since Gambrel did not dispute the trial court's statements at the sentencing hearing, we would be justified in assuming that the court's information was correct. However, no such assumption is needed.
First of all, documents submitted by Gambrel to the trial court in connection with a motion in limine indicate that Gambrel had an extensive prior record, consisting of about twenty-three juvenile charges and eight charges that were apparently filed against him as an adult. The most recent charges before the Piqua robbery were a March 30, 1999 arrest for armed robbery and a June 6, 1999 arrest for forgery and carrying a concealed weapon, all in the State of Georgia.
More important, however, Gambrel, himself, told the trial court that he was on probation from Georgia for hindering apprehension. This remark occurred on the record, during the trial, when Gambrel pled guilty to aggravated robbery. See Trial Transcript, Vol. I, p. 9. Accordingly, the trial court's finding that Gambrel was on probation at the time of the robbery was, in fact, correct. We see no error in the trial court's use of accurate information.
In view of the preceding discussion, the second assignment of error is overruled.
Having found no merit in the Defendant's assignments of error, we affirm the judgment of the trial court.
FAIN, J., and GRADY, J., concur.